1
2
3
4
5
6
7                         IN THE UNITED STATES DISTRICT COURT

8                        FOR THE EASTERN DISTRICT OF CALIFORNIA

9    JOHN HERMAN PIRTLE,

10              Petitioner,                    No. CIV S-04-0518 FCD KJM P

11        vs.

12   CALIFORNIA BOARD OF PRISON
     TERMS, et al.,                            ORDER AND
13
                Respondent.                    FINDINGS AND RECOMMENDATIONS
14   _____/

15              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

16   habeas corpus under 28 U.S.C. § 2254, challenging his 2002 denial of parole.  He alleges that the

17   Board of Prison Terms arbitrarily and capriciously denied parole and that it failed to consider the

18   uniformity clause of California Penal Code § 3031.

19   I.  Background

20              On September 10, 1980, petitioner was sentenced to a term of seventeen years to

21   life following his conviction of second degree murder and use of a gun.  Answer, Ex. A.

22   Petitioner told the probation officer who prepared the report for sentencing that "he would serve

23   whatever time is necessary as quietly as possible and attempt to live with what he did to his

24   former wife, his family and friends."  Answer, Appendix A (App. A) at 452.[1]

25   _____

26        [1]  Appendix A is a copy of petitioner's Central File.

                                        1

In 1987, an evaluation was prepared for a lifer documentation hearing.  The psychiatrist mentioned petitioner's tendency to minimize his problems with alcohol and recommended transfer to an institution with appropriate programs, but observed "[a]t the present time, there are no psychiatric reasons why this subject should remain incarcerated."  Id. at 381.

A report prepared for petitioner's initial parole hearing noted that petitioner had not pursued vocational training nor participated in Alcoholics Anonymous, as had been recommended, and suggested that petitioner "address and deal with his alcoholism" before release.  The correctional counselor noted, however, that petitioner "would probably pose a relatively low degree of threat to the public at this time provided that he abstains from the use of alcohol."  Id. at 343.

A psychiatric evaluation prepared for the initial hearing noted its agreement with "the previous examiner's opinions that there is no applicable psychiatric diagnosis on AXIS I, no diagnosis on AXIS II."  Id. at 377.

Petitioner appeared before a panel of the Board of Prison Terms on March 21, 1990.  Answer, Appendix B (App. B) at 262.[2]  The panel granted petitioner a parole date, "concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  Id. at 306.  Its findings were:

> Number 1.  The prisoner committed the crime as a result of significant stress in his life, namely a stormy marital relationship over a two year period . . . with the victim . . . prior to fatally shooting her.  The prisoner shows signs of remorse.  Immediately after the crime he surrendered himself and the weapon and confessed.  He has indicated he understands the nature and the magnitude of the offense.  He accepts responsibility for the criminal behavior and has a desire to change . . . .

/////

/////

---

[2]  Appendix B is a compilation of transcripts of petitioner's hearings before the Board of Prison Terms.

Secondly, the prisoner had a stable social history prior to the two year marriage to his wife and the victim as exhibited by stable relationships as a father and a good worker.

Number 3.  The prisoner has no juvenile nor adult convictions for felony nor assaultive behavior.  His prior record of convictions consists of six misdemeanors between the age of 27 and 32.

Number 4.  While imprisoned, he has enhanced his ability to function within the law upon release through participation in institution job assignments as an excellent worker, and by being a model inmate.

Number 5.  At age 42 years old, the prisoner has matured, grown, developed understanding, and his advanced age has reduced the possibility of recidivism.

Number 6.  All of the psychiatric reports have indicated improvement and readiness for release.

Number 7.  The prisoner has realistic parole plans which include family support and job prospects in his hometown of Gridley.  He has maintained close family relationships.  The panel notes that a letter from the Chief of Police of Gridley supports his release and return to the prisoner's hometown.

Id. at 306-307.

The panel determined his term to be 158 months, with a release date of December 30, 1994, with a special condition that petitioner abstain from alcohol and attend Alcoholics Anonymous throughout the rest of his stay in prison and while on parole.  Id. at 306-308.

In January 1993, petitioner had another psychiatric evaluation, which again noted petitioner's unblemished disciplinary record, his attendance at AA, his above average work habits, and his "history of episodic alcohol abuse."  App. A at 375.  The writer added that petitioner "is not an impulsive man and demonstrated no antisocially-oriented traits typical of the average inmate."  Id. at 375.  He, too, listed no diagnosis on either Axis I nor Axis II and concluded that "it is felt he will be successful on parole."  Id. at 376.

/////

/////

/////

3

At a progress hearing in April 1993, the panel reviewed petitioner's laudatory work chronos, positive programming, and attendance at AA, granted petitioner four months of good-time for the three years since the prior hearing, which adjusted his parole date to December 1993.  App. B at 258-260.

Nevertheless, in March 1994, a panel of the Board of Prison Terms held a hearing to rescind petitioner's parole.  App. B at 159.  The panel noted that one of the reasons for rescission was that the prior panel did not give "appropriate consideration" to petitioner's extensive history of alcohol abuse and "his failure to participate in AA and other self-help programs to address his alcohol addiction."  Id. at 209.  The panel seemed skeptical of petitioner's earlier assertion that he would not drink because "I wouldn't stick my hand in a jar of rattle snakes, so drinking would be parallel to the same thing . . . ."  Id.  Petitioner responded that he did not think he needed to attend and he didn't "buy the higher power and the step thing."  Id. at 210.  He added that he believed in the concept of "alcoholics getting together and helping each other through the program," but did not agree with the idea that "you got to have this higher power or you won't be successful in the program."  Id. at 213.

The panel rescinded petitioner's parole date.  Among other things, it found that the granting panel had not "given sufficient weight to the circumstances which preceded the murder of the victim," including the fact that petitioner "assaulted and battered his wife on numerous occasions prior to the murder" and on the evening of the crime, "had time to cool off after he had battered her, and instead, returned to the bar."  Id. at 245-246.  The panel also found that the granting panel had not given sufficient weight to the fact that petitioner "was and is an alcoholic who had refused to participate in self-help."  Id. at 247.

A subsequent report, prepared in June 1994, provided an Axis I diagnosis of "alcohol abuse, by history only, in remission," but found no Axis II diagnosis.  App. A at 373.  The evaluating psychologist observed that petitioner's "violence level in the past as well as currently is well below average and . . . the instant offense marks an atypical or out of character

incident for him." Id.  He explained that "the history of domestic abuse occurs within the

context of a two year period preceding the instant offense and was not present during his prior

two marriages . . . indicating a rather unique characteristic of that situation rather than

highlighting chronic behavioral dynamics of this individual." Id.  The evaluator concluded that

petitioner "is not . . . in need of psychotherapy or clinical intervention.. . . From a clinical point

of view, Mr. Pirtle is found to be suitable for parole. . . ." Id. at 374.

In February 1995, petitioner returned to the Board, which found that he was not

suitable for parole because the offense was carried out "in an especially cruel and calloused

manner;" petitioner has "an escalating pattern of criminal conduct and violence" and an

"unstable social history"; petitioner has "failed to profit from society's previous attempts to

correct his criminality;" he "needs therapy in order to face, discuss, understand, and cope with

stress in a non-destructive manner."  App. B at153-154.  The panel recommended that petitioner

upgrade vocationally and educationally, participate in self-help and therapy programs, and

cooperate in a Category X program[3] to explore his potential for violence and the significance of

alcohol in his criminality, among other things. Id. at 155.

In May 1995, petitioner consulted clinical psychologist Jack Fleming, "with

respect to any justification or need for a Category X evaluation, and/or involvement in

psychotherapy."  Dr. Fleming concluded, "To involve this man in any type of psychotherapy, or

to request a Category X evaluation is a needless and profligate waste of professional effort more

wisely extended to emotionally unstable prisoners, or to those who pose a likely danger to

society."  App. A at 181.

/////

---

[3]  The Category X program is "designed to produce specialized diagnostic reports for . . . the Board of Prison Terms . . . The final evaluation is used by the Board of Prison Terms primarily to determine treatment needs and as a resource tool to assist in determining parole suitability. . . . The completed reports will address both the behavioral and psychological aspects of each case, emphasizing special problem areas." Wasko v. California Department of Corrections, 211 Cal.App.3d 996, 1003 (1989).

1          Petitioner returned to the Board in May 1996.  He explained that although

2    "drinking is not an issue" with him, he quit attending AA meetings because his date was

3    rescinded even though he had faithfully attended meetings before then.  App. B at 103-104.  He

4    insisted that he had not "roll[ed] over and give[n] up.  I still maintain my own integrity in here."

5    App. B at 105.

6          Commissioner Baker questioned petitioner about why he had not pursued a

7    Category X or stayed with AA.  App. B at 106.  Petitioner responded that he could not learn the

8    twelve steps because "if you don't believe in a higher power you can not do the 12 steps, and I

9    don't believe in a higher power."  Id.  Commissioner Baker retorted that "the Board believes in

10   the 12 steps because that's a proven program."  Id.

11         The panel denied parole because the commitment offense "was carried out in a

12   manner which exhibits a callous disregard for the life and suffering of another;" petitioner has an

13   escalating pattern of criminal conduct; petitioner has "programmed in a limited manner . . .

14   specifically, the prisoner has not participated in any beneficial self-help or therapy programs

15   during this past year as recommended by the Board, specifically, that being AA."  Id. at 113-114.

16   The Board commended petitioner for remaining disciplinary free and for maintaining satisfactory

17   job performance, but found these factors did not outweigh the factors of unsuitability.  Id.

18         The next hearing was held on December 9, 1998.  App. B at 56.  The panel once

19   again denied parole for the following reasons:

20              The offense was carried out in an especially cruel and callous
            manner and the offense was carried out in a dispassionate and
21              calculated manner. . . . The prisoner has an escalating pattern of
            criminal conduct, a persistent pattern of tumultuous relationships
22              and criminal behavior which commenced at an early age.  He has
            failed previous grants of probation.  He has failed to profit from
23              society's previous attempts to correct his criminality . . . .  He has
            failed to develop a marketable skill that can be used upon release.
24              He has failed to upgrade vocationally, and he has not participated
            in any beneficial self-help programs. . . .
25
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . .
26

6

1    A recent psychological/psychiatric report . . . authored by Dr.
     Albert Shnaider . . . indicates a need for a longer period of
2    observation and evaluation for treatment and he recommended
     therapy. . . . If there isn't an AA program that you want to be
3    involved in, there's nothing else, then we recommend that you go
     to the AA.  If there's something equivalent to that, instead of AA,
4    that's acceptable.

5    Id. at 86-88.

6           On March 25, 2002, petitioner returned to the Board.  Id. at 3.  Before the hearing,

7    a "Life Prisoner Evaluation" was prepared by two correctional counselors, who concluded that:

8    Considering the commitment offense, the minimal criminal history
     and the positive prison adjustment, this writer believes the prisoner
9    would probably pose a low degree of threat to the public at this
     time if released from prison.
10
     Factors considered are the lack of a juvenile criminal history, a
11   minimal adult arrest history, only one State Prison conviction, and
     the fact that Pirtle was previously found suitable for parole by the
12   Board of Prison Terms and has maintained an exemplary program
     since that time.
13

14   App. A at 315.

15          In addition, a psychological evaluation was prepared in September 2001 by

16   Corinne Giantonio, Ph.D. as background for the subsequent parole hearing.  Answer, Ex. D.  The

17   report summarizes prior reports, which were largely favorable.  Id., Ex. D at 4-5.  Dr. Giantonio

18   found petitioner's Axis I diagnosis to be "alcohol abuse, by history, in remission," but found no

19   Axis II diagnosis.  Id., Ex. D at 6.  She concluded:

20   In this case, there are multiple factors indicating a lower risk of
     recidivism.  These include Mr. Pirtle's consistent and long-term
21   employment history, his lack of major mental illness, his
     documented personal growth and insight, his generally positive
22   attitude in the face of legal and emotional adversity, and the
     maintenance of personal support and family relations over the
23   period of his incarceration . . . His ability and willingness to accept
     authority and the direction of the authorities and supervision also
24   argue in favor of his ability to cooperate with supervisory aspects
     of parole.  A stable childhood history also argues in his favor.  His
25   insight into his episodic use of alcohol and its role which he
     regards as interfering with good judgment and self-control also
26   argue in his behalf.

7

> Assessment of dangerousness within the controlled setting of the institution is seen as definitely below average in comparison with other inmates.  Assessment of dangerousness, if released to the community, is also seen as definitely below average.  His current gains are expected to be maintained as they have been self-directed and self-incorporated.

Id., Ex. D at 7-8.  Dr. Giantonio recommended that petitioner become involved with an AA-type program for atheists, noting that "many people have historically been unable to advantage themselves of the 12-Step Program because of its integrative belief system that is religious in nature. . . ."  Id.  She concluded that:

> Mr. Pirtle is competent and responsible for his behavior with no primary mental health disorder.  Any decision for prerelease planning can be made on the record of his successful programming.  There are no further psychological recommendations.

Id.

At the hearing, the panel began by surveying petitioner's stint in the Air Force and his honorable discharge in 1969, his first two marriages and his contact with his daughter, the child of his first marriage.  App. B at 16-17.  The panel also noted that petitioner first began to abuse alcohol at the age of fifteen and that both his and the victim's alcohol abuse had contributed to the problems in that marriage.  Id. at 17.  Petitioner told the panel that his drinking was sporadic: he could go for years without drinking but then drink for a few months.  Id. at 19.  The panel also reviewed the six instances that Gridley police were called because of domestic incidents–some physical and others verbal–between petitioner and the victim.  Id. at 17-18.  In response to a question from the District Attorney of Butte County, petitioner denied ever pulling a knife on the victim, as had been suggested in the probation report.  Id. at 37.

The panel noted that petitioner had not upgraded vocationally, although prior panels had recommended that he do so, but noted that he has "several skills already . . . [m]echanic, welder, small equipment operator, heavy duty equipment operator."  App. B at 21, 44.  Petitioner told the Board he had an offer of employment were he to be paroled, doing ranch

1  work with Giovannetti and Sons in Live Oak, and would live with his sister.  App. A at 240;

2  App. B at 27, 32.

3          The panel acknowledged his disciplinary-free record and "excellent work record,"

4  including laudatory chronos from his supervisor at the inmate canteen and his favorable

5  evaluation from his current job in the library.  App. A at 173; App. B at 21, 34-35.

6          Petitioner told the panel that he had attended AA after the 1990 hearing, when he

7  was given a parole date, but maintained his basic unease with the program because of its focus

8  on God.  App. B at 26-27.  However, as noted in the life prisoner evaluation report, petitioner

9  agreed to "involve himself in any . . . secular program that is available in his area of parole and

10  his family . . . has apprised him of substance abuse programs in the area that meet that criteria."

11  App. A at 315.  Petitioner presented the panel with a list of secular sobriety programs in

12  Northern California.[4]  App. B at 31.

13          The Board of Prison Terms denied him a parole date for the following reasons:

14          The Panel reviewed all information received from the public and
            relied on the following circumstances in concluding that the
15          prisoner is not suitable for parole and would pose an unreasonable
            risk of danger to society or a threat to public safety if released from
16          prison.  The offense was carried out in an especially cruel and
            callous manner.  The offense was carried out in a dispassionate
17          calculated manner.  The offense was carried out in a manner which
            demonstrates an exceptionally callous disregard for human
18          suffering.  The motive for the crime was inexplicable or very
            trivial in relationship to the offense.  The conclusion was drawn
19          from the Statement of Facts where on March 8, 1980 at
            approximately 1:17 a.m. the Gridley . . . Police Department was
20          notified of a shooting at The Moose Lodge.  Upon arrival, they
            found the victim, Diane, the prisoner's wife . . . was lying on the
21          floor with a gunshot wound to her upper chest area.  The
            circumstances around the shooting is that the prisoner went into
22          The Moose Lodge, and observed his wife dancing with another
            person.  He went into (inaudible).  He walked up and put his arms
23          around her and used a 25 caliber weapon to shoot her.  He placed it
            to her chest and shot her in the chest, and that penetrated her heart
24          and her liver, and she succumbed to her wounds.  The prisoner has
            an escalating pattern of criminal behavior.  He's failed previous

25

26          [4] The list itself is not in the record in this case.

grants of probation and cannot be counted upon to avoid criminality. . . . He's failed to profit from society's previous attempts to correct his criminality.  Such attempts include adult probation and county jail.  The prisoner's unstable social history would primarily be centered around his alcohol abuse . . . .  His prior criminality includes arrests for disorderly conduct, escape from a county farm, speed contest and a DWI, driving while under the influence.  Also, it's noted that an unstable social history, I guess we should also note the prisoner's domestic encounters.  His escalating pattern of domestic encounters where the police department was frequently called because of domestic allegations that the prisoner was being abusive to his wife, for fights withe the prisoner and his wife.  So, we had an escalating pattern of domestic violence conduct.  The prisoner has failed to upgrade vocationally as previously recommended by other Panels.  The prisoner got a good psychiatric report.  The psychiatric report by Dr. Giantonio was a supportive report.  The prisoner's parole plans, the prisoner has made parole plans.  They could use some tightening up, but overall, the prisoner has made some effort to develop parole plans (inaudible) has been in prison for over 20 years.  So, he did put some effort into that.  The Hearing Panel notes that in response to Penal Code 3042 notices indicate an opposition to a finding of parole suitability.  And specifically, . . . the District Attorney . . . Butte County spoke in opposition of a finding of suitability at this time.  The Panel makes the following findings.  The prisoner needs to be able to face, discuss, understand and cope with stress in a non-destructive manner.  Until progress is made, the prisoner continues to be unpredictable and a threat to others.  Nevertheless, there are some things that the prisoner should be commended for.  The prisoner did take an Alternatives to Violence program.  He gets good work reports. . . – And he got a good psychiatric report from the doctor.  However, these positive aspects of his behavior does [sic] not outweigh the factors of unsuitability.  Parole is denied for two years.  In a separate decision, the Hearing Panel finds that it's not reasonable to expect that parole would be granted at a hearing during the following two years.  Specific reasons for these findings are as follows.  The prisoner committed the crime in an especially cruel manner.  His wife was at a Moose Lodge.  She was dancing.  The prisoner went there previously and . . . slapped his wife.  He left.  He had a lot of time to think about it.  He encountered a police [officer] who told him to go home and get some sleep.  He went home to get some sleep, and he retrieved a weapon.  He came back to the lodge, and he shot his wife down on the dance floor.  The offense was carried out in a dispassionate and calculated manner.  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  The motive for the crime was inexplicable or very trivial in relationship to the offense.  The prisoner had a history of unstable or tumultuous relationships with others.  He had been married three times, and his last marriage he characterized as turbulent.  The prisoner has not

completed necessary programming, which is essential to his adjustment, and he needs additional time to gain such programming. He's not participated in the vocational programs that's available at the different institutions. He's failed to participate in substance abuse programming. Now, let it be clear that the Board does not advocate any one type of substance abuse program over another one, that is a faith based program over a non-faith based program. But, certainly, with the prisoner's history of substance abuse and alcohol use, he should be involved in some kind of substance abuse program, and it should not only be a substance abuse program while incarcerated, but it should be a commitment. In your parole plans, sir, there should be (inaudible) substance abuse planning that you're committed to being involved in some type of substance abuse program, especially with your prior record (inaudible) where people were injured. So, you have to get involved in some type of substance abuse program. Therefore, the Panel recommends that you remain disciplinary free, that if available, you upgrade vocationally, and that you participate in some type of substance abuse program or self-help program. For that matter, any other type of self-help program that deal [sic] with anger management, stress management, those type of things. Mr. Pirtle, it seems like you want to do it your way in terms of getting a parole date. . . .We can't just take your word that you're not going to get involved in any type of substance abuse once you get out. You've been in prison. The Boards have told you to participate in vocational kinds of programs, and during our deliberation we talked about whether you would get involved and try to become a bartender or not. But, sir, as long as you've been in prison you've had the opportunity to get a vocation, certainly as long as you've been in prison you've had the opportunity to get involved in some type of substance abuse program. And with your record, you must realize that there is an awesome responsibility for this Board to try to determine a parole date for you when you have not made a lifelong commitment to a substance abuse program. . . . It's too much of a risk to The People of Butte County and The People of California to sit here and take your word because when you went to that other (inaudible) for substance abuse problem, you didn't stay there. You escaped. And you went out and still got involved in alcohol. And it appears that your alcohol abuse had something to or related to – had something to do with a direct correlation between the crime that you committed. So, that's why you're [sic] parole was denied two years, sir.

Answer, Ex. B, Board Decision 1-7.

The California Supreme Court denied petitioner's challenge to his denial on

December 10, 2003. Answer, Ex. F.

/////

II.  <u>Standards Under The AEDPA</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  <u>See</u> <u>Ramirez v. Castro</u>, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); <u>see</u> <u>also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[5]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  <u>Lockyer</u>, 538 U.S. at 71 (overruling <u>Van Tran v. Lindsey</u>, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by

/////

---

[5]  In <u>Bell v. Jarvis</u>, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent <u>Bell</u> stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  <u>See</u> <u>Lockyer</u>, 538 U.S. at 70-71; <u>Ramirez</u>, 365 F.3d at 773-75.

1    § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

2    by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

3            The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

4    different.  As the Supreme Court has explained:

5            A federal habeas court may issue the writ under the "contrary to"
             clause if the state court applies a rule different from the governing
6            law set forth in our cases, or if it decides a case differently than we
             have done on a set of materially indistinguishable facts.  The court
7            may grant relief under the "unreasonable application" clause if the
             state court correctly identifies the governing legal principle from
8            our decisions but unreasonably applies it to the facts of the
             particular case.  The focus of the latter inquiry is on whether the
9            state court's application of clearly established federal law is
             objectively unreasonable, and we stressed in Williams [v. Taylor,
10           529 U.S. 362 (2000)] that an unreasonable application is different
             from an incorrect one.

11

12   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

13   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

14   fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

15   (2002).

16           The court will look to the last reasoned state court decision in determining

17   whether the law applied to a particular claim by the state courts was contrary to the law set forth

18   in the cases of the United States Supreme Court or whether an unreasonable application of such

19   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

20   919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

21   of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

22   must perform an independent review of the record to ascertain whether the state court decision

23   was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

24   words, the court assumes the state court applied the correct law, and analyzes whether the

25   decision of the state court was based on an objectively unreasonable application of that law.

26   /////

1     It is appropriate to look to lower federal court decisions to determine what law

2  has been "clearly established" by the Supreme Court and the reasonableness of a particular

3  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

4  III.  Parole In California

5     In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United

6  States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

7  even when a state establishes a system of conditional release from confinement.  The Court

8  recognized, however, that the structure of parole statutes might give rise to a liberty interest in

9  parole that would, in turn, mean an inmate was entitled to certain procedural protections.  Id. at

10  14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the

11  Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen (Allen), 482

12  U.S. 369, 371 (1987).

13     In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used

14  the Greenholtz-Allen framework to determine whether California statutes created a liberty

15  interest in parole.  The critical statute at issue in McQuillion is California Penal Code section

16  3041, which provides in relevant part:

17         (a) In the case of any prisoner sentenced pursuant to any provision
              of law, other than [the determinate sentencing law], the Board of
18         Prison Terms shall meet with each such inmate during the third
              year of incarceration for the purposes of reviewing the inmate's
19         file, making recommendations, and documenting activities and
              conduct pertinent to granting or withholding post-conviction
20         credit. One year prior to the inmate's minimum eligible parole
              release date a panel consisting of at least two commissioners of the
21         Board of Prison Terms shall again meet with the inmate and shall
              normally set a parole release date as provided in Section 3041.5.[6]
22         The release date shall be set in a manner that will provide uniform
              terms for offenses of similar gravity and magnitude in respect to
23         their threat to the public, and that will comply with the sentencing
              rules that the Judicial Council may issue and any sentencing
24         information relevant to the setting of parole release dates. The

25

26     [6] Cal. Penal Code § 3041.5 establishes procedural requirements for Board hearings.

> board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime....
>
> (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

The Ninth Circuit found that subdivision (b) was like the statutes in both Greenholtz and Allen:

> California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme "'creates a presumption that parole release will be granted'" unless the statutorily defined determinations are made.

McQuillion, 306 F.3d at 901-02.  Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), the Court of Appeals reiterated its holding that the California parole scheme created a liberty interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the question because its "language clearly parallels the language" under consideration in Greenholtz and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002), cert. denied, 538 U.S. 980 (2003) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in light of the circumstances specified by statute and regulation").

The existence of a liberty interest means that a decision to deny parole must be supported by some evidence and not be otherwise arbitrary.  Superintendent v. Hill, 472 U.S. 445, 455 (1985); Jancsek v. Oregon Board of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  The test is "not whether some evidence supports the *reasons* . . . for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety."  In re Lee, 143 Cal.App.4th 1400, 1408 (2006) (emphasis in original).  The evidence must have some indicia of reliability.  Biggs, 334 F.3d at 915.  The "some evidence" requirement is a "minimally

/////

stringent" standard and does not require the court to reweigh the evidence or examine the entire

record.  Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); Hill, 472 U.S. at 455-56.

> [The] analysis is framed by the statutes and regulations governing parole suitability determinations . . . . [W]e must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" . . . and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" [] constituted an unreasonable application of the "some evidence standard" principle articulated in *Hill*.

Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007).

The Board's regulations for setting parole release dates are found in title 15 of the

California Code of Regulations.  Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.
>
> The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

15 Cal. Code Regs. § 2401.

/////

/////

Section 2402 provides:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

/////

/////

17

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

/////

18

1        (7) Age. The prisoner's present age reduces the probability of recidivism.

2

3        (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

4

5        (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

6 15 Cal. Code Regs. § 2402.

7        Once the Board determines that an inmate is suitable for parole, it proceeds to set

8 a date for the inmate's release, based on numerous factors provided in sections 2403 through

9 2411.  The paramount concern in determining parole suitability is public safety.  In re

10 Dannenberg, 34 Cal.4th at 1080, 1084, 1085, 1086 ("the overriding statutory concern" is for

11 public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the

12 public safety implications" of the release determination).

13 IV.  Arbitrary Denial Of Parole

14        Petitioner argues that his "crime . . . is . . . not an evidential reason for finding him

15 unsuitable" because it is not especially heinous, atrocious or cruel.  Pet., Memorandum of Points

16 and Authorities (Mem. P. & A.) at 7.  He also argues that his minor criminal history should be

17 deemed a suitability, rather than an unsuitability, factor under the regulations and that his

18 "criminal record has not changed during his incarceration," making reliance on it arbitrary.  Id. at

19 9.  Next, he argues that his failures to pursue self-help programs and vocational programs "are

20 not valid reasons" for the denial of parole.  Id. at 10.  Finally, he contends that he is being

21 penalized for not attending Alcoholics Anonymous despite his objections to its religious basis,

22 and his stale history of alcohol abuse is not a sufficient basis for the denial of parole.  Id.  None

23 of the Board's reasons for the denial, in petitioner's view, has any bearing on public safety and

24 ignore the two reports prepared for the hearing, which found his violence potential to be low.  Id.

25 at 11.

26 /////

A.  The Crime

The Board found that the crime was committed in an especially heinous, atrocious, or cruel manner because it was carried out in a dispassionate, calculated and cruel manner with an exceptionally callous disregard for suffering and because the motive was inexplicable or trivial in relationship to the offense.  See 15 Cal. Code Regs. § 2402(c)(1)(B), (D)-(E).

1.  Cruel and Callous Disregard For Suffering

In In re Smith, 114 Cal.App.4th 343 (2003), the California Court of Appeal for the Sixth Appellate District considered the question when a second degree murder can be deemed cruel and callous to human suffering so as to demonstrate an inmate's nonsuitability for parole.   The court in Smith observed that :

> [I]t can reasonably be said that *all* second degree murders by definition involve some callousness–i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.

Id. at 366 (emphasis in original).  As with petitioner, Smith had been convicted of second degree murder for killing his wife after learning that his disintegrating marriage was beyond repair as a result of his wife's unfaithfulness.  When the victim told Smith she "did not want anything further to do with [him]," he took a gun and shot her once in the head and then twice more as she fell.  Id. at 351.  The court found that the crime was not cruel or callous to the suffering of others:

> There is no evidence that Smith acted with cold, calculated dispassion; or that he tormented, terrorized, or injured Garner before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. . . . Was the crime callous?  Yes.  However, are the facts of the crime some evidence that Smith acted with exceptionally callous disregard for Garner's suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous?  No.

Id. at 367; see also In re Lee, 143 Cal.App.4th at 1409 ("measure of atrociousness is not general notions of common decency or social norms. . . . Rather, the inquiry is whether among murders

20

the one committed by Lee was particularly heinous, atrocious or cruel"); In re Dannenberg, 34
Cal.4th at 1095 (a murder is "particularly egregious" if there is violence or viciousness beyond
what is minimally necessary for conviction).

In this case, the day before the shooting, petitioner and his wife had a lengthy
discussion about their marital problems and decided to make a further attempt to repair their
marriage.  App. B at 12.  The next day, his wife told him she wanted to stay in town to drink
after work; when he later found her at the Moose Lodge, she was with another man.  Upset, he
slapped her and left, drank some more and then returned home and went to bed.  App. B at 11,
13.  When he woke up, his wife was not home, so he returned to the Moose Lodge and found her
dancing with another man.  He ordered a drink, waited for the music to stop, and then asked if
she was ready to go home.  Id.  When his wife said she was going to go home with Ron, her
dancing partner, he put his arm around her and shot her in the chest.  Id. at 12, 13; App. A at 490
(Court of Appeal opinion reports that the bartender at the Moose Lodge testified that the victim
said "I finally left him tonight").

As in Smith, the facts underlying petitioner's conviction do not support a finding
that the crime was cruel or callous and, by extension, a finding that petitioner remains a danger
to society.  Petitioner did not torment or terrorize his wife; his earlier slap, while inappropriate,
did not appear to have an effect on the victim, who continued to drink and dance.  There is
nothing to suggest that he gratuitously caused her to suffer; nothing in the record suggests that
she lived for long after the single bullet penetrated her heart.

2.  Calculated And Dispassionate

In defining a "calculated and dispassionate" murder, the regulation refers to an
execution-style murder as an example.  The dictionary definitions support the connection
between this factor and an execution-style killing:  "dispassionate" means "free from or
unaffected by passion; devoid of personal feeling or bias; impartial; calm," while "calculated
means "carefully thought out or planned."  See www.dictionary.com  <accessed 3/7/07>.

1    The instant record does not support the finding that the murder was calculated and

2    dispassionate.  Personal feeling and emotion is what fueled the crime, for petitioner acted in the

3    knowledge that his attempts to salvage his marriage had failed and after his wife had told him

4    she was going home with another man.  Moreover, nothing in the record indicates the killing was

5    carefully thought out or planned: petitioner killed his wife in full view of witnesses after being

6    rejected by his wife.

7    3.  <u>Inexplicable or Trivial Motive</u>

8    In <u>In re Scott</u>, 119 Cal.App.4th 871 (2004), the Court of Appeal for the First

9    Appellate District considered the meaning of these terms as they relate to the parole decision.  In

10   that case, the inmate killed a man who had threatened him, cuckolded him and supplied his wife

11   with drugs.  The Board of Prison Terms denied him parole on the ground, among others, that the

12   motive was inexplicable or trivial.  The court disagreed:

13       The epistemological and ethical problems involved in the
         ascertainment and evaluation of motive are among the reasons the
14       law has sought to avoid the subject. . . . An "inexplicable" motive,
         as we understand it, is one that is unexplained or unintelligible, as
15       where the commitment offense does not appear to be related to the
         conduct of the victim and has no other discernible purpose.  A
16       person whose motive for a criminal act cannot be explained or is
         unintelligible is therefore unusually unpredictable and dangerous.

17

18   <u>Id</u>. at 892-93.  Moreover,

19       [t]he reference in Board regulations to motives that are "very
         trivial in relationship to the offense" therefore requires
20       comparisons; to fit the regulatory description, the motive must be
         materially less significant . . . than those which conventionally
21       drive people to commit the offense in question, and therefore more
         indicative of a risk of danger to society if the prisoner is released .
22       . . .

23   <u>Id</u>. at 893.  The court found that Scott's motive was neither trivial nor inexplicable, for "the

24   emotional pain caused by the departure or infidelity of a loved one is often seen by juries as

25   diminishing self-control. . . ."  <u>Id</u>. at 894.  It concluded that the finding that the motive was

26   inexplicable or trivial "ignores . . . human nature and experience."  <u>Id</u>.

1   The same reasoning applies to this case.  The motive was not inexplicable,

2   because it was related to the conduct of the victim in the context of petitioner's shaky marriage;

3   as Dr. Sprick observed in 1994, the instability of this third marriage was "a rather unique

4   characteristic of that situation rather than . . .chronic behavioral dynamics of this individual."

5   App. A at 373.  The motive was not trivial because it was related to "emotional pain caused by

6   the . . . infidelity" of petitioner's wife.[7]  The panel that granted petitioner parole in 1990 found

7   that the circumstances relating to petitioner's shooting of his wife suggested that the crime was

8   committed as a result of significant stress in petitioner's life.  App. B at 306.

9   B.  Escalating Pattern Of Criminal Behavior; Failure To Profit From Society's Attempts
        To Correct His Criminality

10

11   The panel recognized that petitioner has no record of juvenile arrests, but had

12   volunteered the fact that he had been arrested at age fourteen for forging a check on his uncle's

13   account, had served seven days in juvenile hall and thereafter been placed on probation.  App. B

14   at 15.  The lack of a juvenile record of violent or assaultive behavior is a factor suggesting

15   suitability for parole, which the panel appears not to have recognized. 15 Cal. Code Regs.

16   § 2402(d)(1); see also Life Prisoner Evaluation, App. A at 315 ("the minimal criminal history" is

17   one factor suggesting that petitioner would pose a "low degree of threat to the public" if

18   paroled).

19   Petitioner's record as an adult consists of one felony--a 1975 drunk driving with

20   injury--, and several misdemeanors—drunk driving, disturbing the peace, disorderly conduct,

21   and escape from the county honor farm.  App. B at 15; App. A at 450.

22   To "escalate" is "to increase in intensity, magnitude, etc."  See

23   www.dictionary.com  <accessed 3/7/07>.  A record consisting of a string of misdemeanors and a

24

25   [7]  The court cannot help but be reminded of the universal themes expressed in William
26   Shakespeare's Othello, despite multiple distinctions in plot as between that great tragedy and
     petitioner's story.  See especially Othello, Act 5, sc. 2

single felony does not fit neatly within the definition of escalation; indeed, petitioner's lack of "any significant history of violent crime" is a factor suggesting suitability for parole.  15 Cal. Code Regs. § 2402(d)(6).  There is not substantial evidence supporting the panel's conclusion that petitioner's twenty-five year old criminal record shows that he would pose a danger to the public if released.

The panel also relied on petitioner's failure to profit from society's attempts to correct his criminality, which included grants of probation, which he failed, and county jail. App. B at 48.  The probation report prepared for petitioner's Butte County sentencing in 1980 listed his criminal record and the punishment for each conviction; there is no indication that petitioner was put on probation, much less that he failed a grant of probation.  App. A at 450. Petitioner did serve two jail terms in 1976, a nine month sentence for the drunk driving with a consecutive six month sentence for the escape from the honor farm.  App. A at 450.  This does not qualify as some evidence that petitioner "cannot be counted on to avoid criminality," for the predictive power of this old record has been dissipated through the passage of time and petitioner's unblemished prison record; its minor nature is actually a factor favoring suitability under the regulations.  As the California Court of Appeal has recognized, this factor must be viewed "within the context of the other factors [the panel] must consider to see if some evidence shows [the inmate] continues to pose an unreasonable risk to public safety."  In re Lee, 143 Cal.App.4th at 1409.

C. Unstable Social History

The 1990 panel that granted parole found petitioner's social history to be stable apart from his two year marriage to the victim.  App. B at 306.  The panel that considered petitioner's application for parole in 2002 found that his social history was unstable because of his alcoholism and the instances of domestic violence during petitioner's marriage to the victim. Id. at 48-49.

/////

1.  Tumultous Relationships

Dr. Giantonio's report contains a summary of petitioner's social history.  It examined petitioner's stable upbringing despite his parents' divorce, his two uneventful marriages to two women before his marriage to the victim, his role as custodial parent to his children from his first marriage, followed by his turbulent marriage to the victim, who engaged in extramarital affairs and essentially left petitioner to be a parent not only to his two children, but to her own two children.  Answer, Ex. D at 2-4.

In In re Scott, 119 Cal.App.4th at 896, the court examined a finding similar to that of the 2002 panel and found that it was not supported by sufficient evidence.  In Scott, the psychologist's report prepared for the panel noted that the inmate had an "exemplary family history," no substance abuse or psychological problems apart from the brief adjustment disorder occasioned by his wife's drug abuse and infidelity.  The court concluded, therefore, that even though the inmate had had an "unstable or tumultuous" relationship with the victim, that was not sufficient evidence to support the panel's finding in light of his otherwise stable social history.

The Court of Appeal for the Sixth Appellate District reached a similar conclusion in In re Smith, supra.  In Smith, the Governor overturned a grant of parole in part because of the inmate's "'deep-rooted pattern' of social instability, drug use and violence against the victim." Smith, 114 Cal. App. 4th at 368.  In that case, as here, the psychologist found that the inmate's violence "was focused on only one person and manifest for only two years" and that there was no violence in his other relationships or in prison.  Id. at 369.

Here, the record reflects petitioner's single unstable relationship was with the victim of the commitment offense; the only reports of domestic violence flowed from this single relationship.  Nothing in the record contradicted the psychologist's reliance on petitioner's "stable childhood," and "the maintenance of personal support and family relations" to determine that petitioner poses a "below average" risk of danger upon release.  Answer, Ex. D at 8.

/////

1          2.  Alcohol Abuse[8]

2          The psychologist considered petitioner's history of alcohol abuse, which includes

3  "sporadic and periodically heavy usage of alcohol from time to time," and his recognition that he

4  can "never return to its use."  Answer, Ex. D at 4.  She described his "insight into his episodic

5  use of alcohol and its role which he regards as interfering with good judgment and self-control."

6  Id. at 8.  His Axis I diagnosis was "alcohol abuse, by history, in remission."  Id., Ex. D at 6.

7          It is not disputed that petitioner attended Alcoholics Anonymous only until his

8  parole date was rescinded in 1994.  However, the psychologist observed only that "should a

9  parole date be offered, it is recommended that Mr. Pirtle advantage himself of these AA

10  programs for Atheists."  Id., Ex. D at 8.

11          There also is no dispute that petitioner's abuse of alcohol was a factor in his

12  drunk driving convictions and the commitment offense.  However, there is nothing in the record

13  to contradict the diagnosis of "alcohol abuse, by history, in remission" or suggest that petitioner

14  would be prone to returning to alcohol, and by extension, to instability, when released.

15          Again, a similar situation was addressed in In re Smith, supra.  In that case, the

16  inmate had a lengthy history of substance abuse which, the court found, did not directly lead to

17  the murder of his wife.  The Governor had reversed the finding that the inmate was suitable for

18  parole in part because of a perceived need for further drug treatment.  The Court of Appeal

19  rejected this rationale:

20  /////

21  /////

22

23          [8] Perhaps it is significant or perhaps it is an oversight, but the panel did not base its
24  denial on petitioner's failure to attend AA or its secular counterpart.  It did, however, mention
petitioner's need for further treatment or self-help in making the "separate decision" that it was
not likely that parole would be granted in the next two years.  App. B at 51-52.  To the extent
25  that this can be deemed to be part of the denial, as in Smith, there is nothing in the record
suggesting that treatment in prison would render petitioner less dangerous than if he received
26  treatment in the community after release.

> There is no evidence that Smith denies he had a drug problem or denied he had a problem for some period of his incarceration. There is no evidence that he refused, failed, or did poorly in drug treatment programs.  And there is no evidence that Smith ever used any type of illicit substance during his incarceration.  Nor does the record support a reasonable belief that without further drug treatment *in prison*, Smith might start taking drugs again.

Id. at 371 (emphasis in original).  In this case, petitioner attended Alcoholics Anonymous when the Board made that a condition of release, but then stopped after his date was rescinded because of his disagreement with the program's focus on religious principles.  Cf. Turner v. Hickman, 342 F.Supp.2d 887, 896 (E.D. Cal. 2004).  More fundamentally, however, in light of the diagnosis of alcohol abuse in remission and the psychologist's and counselor's opinions that petitioner's potential for violence upon release was below average, the record does not support the panel's determination that petitioner's abuse of alcohol up to 1980 rendered him dangerous in 2002.

### D.  Failure To Upgrade Vocationally

While petitioner had not, perhaps, upgraded vocationally, he had maintained steady employment while in the institution, building an employment record characterized as "exceptional."  App. A at 317-318.  Moreover, as petitioner told the panel, he had job skills and an offer of employment on release.  App. B at 21, 27, 44.  The Court of Appeal for the Sixth Appellate District observed in the case of DeLuna:

> The Board stated that defendant had failed to upgrade his vocational training, apparently dissatisfied with defendant's training in landscape and gardening.  While there is evidence that defendant has concentrated in prison on certain vocational skills, we do not perceive any connection between his gardening skills . . . and the Board's conclusion that "he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  Nothing in the record indicates that defendant's criminality  or ability to support himself was affected by any limitation of his vocational . . . skills.

In re DeLuna, 126 Cal.App.4th 585, 597 (2005).  In this case as well, there is no connection between what the panel perceived as petitioner's limited vocational skills and his life crime, and

nothing to suggest that his failure to secure other job skills renders him dangerous.

E. <u>Need For Therapy To Cope With Stress</u>

Dr. Giantonio found:

> Mr. Pirtle evidences signs of maturity, personal insight and personal growth. He admits to feelings of discouragement and hopelessness during which period he tends to withdraw and isolate. . . . . [H]e remains cooperative with prisoner programming and continues his impeccable record with no CDC-115s at any time during his incarceration. He is an avid reader and utilizes both fiction and nonfiction to help him cope with his more difficult days.

Answer, Ex. D at 6. She continued:

> Mr. Pirtle is competent and responsible for his behavior with no primary mental health disorder. Any decision for prerelease planning can be made on the record of his successful programming. There are no further psychological recommendations.

<u>Id</u>., Ex. D at 8. As the Court of Appeal for the First Appellate District held on a similar psychologist's report:

> [T]he Board lacked even "some evidence" to support the finding that [t]he prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner.

<u>In re Ramirez</u>, 94 Cal.App.4th 549, 571 (2001), <u>disapproved on other grounds</u>, <u>In re Dannenberg</u>, 34 Cal.4th 1061 (2005). The finding in this case similarly lacks evidentiary support.

F. <u>Other Considerations</u>

In <u>Biggs</u>, 334 F.3d at 916, the Ninth Circuit suggested that

> [o]ver time. . . should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

<u>See also</u> <u>Sass v. California Board of Prison Terms</u>, 461 F.3d 1123, 1129 (9th Cir. 2006).

/////

/////

1  However, in Irons, the court said:

> We note that in all the cases in which we have held that a parole
> board's decision to deem a prisoner unsuitable for parole solely on
> the basis of his commitment offense comports with due process,
> the decision was made before the inmate had served the minimum
> number of years required by his sentence. . . . All we held in those
> cases and all we hold today, therefore, is that, given the particular
> circumstances of the offenses in these cases, due process was not
> violated when these prisoners were deemed unsuitable for parole
> prior to the expiration of their minimum terms.

7  479 F.3d at 665.[9]

8          In California, an inmate has a minimum eligible parole date (MEPD), which is the

9  earliest date a "life prisoner may legally be released on parole."  15 Cal. Code Regs.

10  § 2000(b)(67).  At the time petitioner was sentenced, this date was computed by applying

11  postsentence good time and work time credits to the minimum term of fifteen years for second

12  degree murder.  See In re Dayan, 231 Cal.App. 3d 184, 186 (1991).  Petitioner's MEPD was

13  August 6, 1989.  App. A at 24.

14          If the minimum term of fifteen years is the Irons triggering point for second

15  degree murder, then petitioner reached this date long ago:  his minimum term of seventeen years,

16  even without considering any credits, was September 12, 1997.  App. A at 23.

17          Petitioner appeared before the Board in 1998 and 2002, both times after his

18  minimum term had already run. Each time, the Board relied on factors no longer within

19  petitioner's control--the nature of the crime and his prior history, both criminal and social, while

20  barely acknowledging petitioner's clean institutional record, steady work history, maturity and

21  introspection--rendering the decision to deny him parole arbitrary and a violation of his liberty

22  interest in parole.

23  /////

24  /////

25

26      [9]  The court did not explain why the arbitrary nature of continued reliance on unchanging
    factors may violate due process only after the minimum sentence has been served.

V.  Uniformity Under Penal Code § 3041(a)

In Dannenberg, the California Supreme Court noted:

> Our conclusion that California's parole statutes allow the Board to find unsuitability without engaging in a comparative analysis of other offenses or applying "uniform term" principles, and that the Board adhered to state law in Dannenberg's case, also disposes of his contention that he was denied federal due process rights arising from his protected liberty interest, and expectation, in a "uniform" parole release date.

Dannenberg, 34 Cal.4th at 1098 n.18.  In the case, the state supreme court resolved the "tension between the commands in subdivisions (a) and (b)" of Penal Code section 3041, and the question whether "the public-safety provision of subdivision (b) takes precedence over the 'uniform terms' principle of subdivision (a)."  Id. at 1081-82.  To answer the question, the court examined related legislation, statutory language, case law and agency interpretations.  It noted that

> [s]o long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board, the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders.  Section 3041 does not require the Board to schedule an inmate's release when it reasonably believes the gravity of the commitment offense indicates a continuing danger to the public, simply to ensure that the length of the inmate's confinement will not exceed that of others who committed similar crimes.

Id. at 1084 (internal citation omitted).  The court recognized the Board's broad discretion in determining an inmate's suitability for parole, but also recognized that "the current statute requires the Board to act in each case, either by setting a parole release date, or by expressly

/////

/////

/////

/////

/////

/////

1declining to do so for reasons of public safety." <u>Id</u>. at 1098.  Its ultimate holding is this:

> We therefore hold that the Board proceeded lawfully when, without comparing Dannenberg's crime to other second degree murders, to its base term matrices, or to the minimum statutory prison term for that offense, the Board found him unsuitable to receive a fixed and "uniform" release date by pointing to some evidence that the particular circumstances of his crime . . . indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.

<u>Id</u>.  What <u>Dannenberg</u> did, then, was to find that the provisions of section 3041(a), which appear to require the Board to set a minimum, uniform term, did not create a liberty interest in parole, because the parole board was required to undertake the public safety inquiry of subdivision (b) before setting a uniform term.  In this case, because the Board failed to find petitioner suitable, there is no independent due process violation flowing from its failure to set a uniform term for him.

VI.  <u>Request For Judicial Notice</u>

Petitioner has asked the court to take judicial notice of subsequent denials of parole, which are based on essentially the same reasons given by the panel in 2002 and has attached copies of parole board decisions from 2004 and 2006.  This motion is granted.  Fed. R. Evid. 201(b)(2).

The 2004 and 2006 hearings show that the Board continues to rely on the "callous" circumstances of the crime, petitioner's criminal record, his unstable relationships, his failure to upgrade vocationally and to pursue self-help programs, particularly those for alcoholics.  Mot. For Judicial Notice, Ex. A at 1-4 & Ex. B at 1-4.

VII.  <u>The Remedy</u>

In 2002 the Board relied on factors not supported by the requisite "some evidence"; it has continued to rely on those factors to deny petitioner parole.  In these circumstances, directing the Board to hold another hearing would be futile.

/////

1    IT IS HEREBY ORDERED that:

2        1.  The Federal Defender's Office be appointed to represent petitioner; and

3        2.  The Clerk of the Court is directed to serve a copy of this order on David

4    Porter, Assistant Federal Defender.

5        IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

6    habeas corpus be granted and the Board of Prison Terms set a parole date for petitioner within

7    thirty days of any order adopting these findings and recommendations.

8        These findings and recommendations are submitted to the United States District

9    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10   days after being served with these findings and recommendations, any party may file written

11   objections with the court and serve a copy on all parties.  Such a document should be captioned

12   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13   shall be served and filed within ten days after service of the objections.  The parties are advised

14   that failure to file objections within the specified time may waive the right to appeal the District

15   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16   DATED:  April 16, 2007.

17   _____

18   U.S. MAGISTRATE JUDGE

19

20

21   2

22   pirt0518.157

23

24

25

26

32